STATE OF MAINE                                    UNIFIED CRIMINAL DOCKET
CUMBERLAND, ss.                                   DOCKET NO. CV-21-03334


STATE OF MAINE                          )
                                        )
                                        )
                                        )
    v.                                  )    ORDER ON DEFENDANT'S MOTION
                                        )    TO SUPPRESS
JEROME MORRIS                           )
                                        )
        Defendant                       )
                                        )
                                        )
                                        )

Before the Court is Defendant Jerome Morris's ("Morris") Motion to Suppress

Statements and Evidence. For the reasons set forth herein, Morris's Motion is DENIED.

### FACTUAL BACKGROUND

Based on the testimony provided and exhibits admitted at hearing, as well as the parties'

filings in this case to date, the Court finds that the following facts are supported by the record:

In late June of 2021, the Maine Drug Enforcement Agency ("MDEA") obtained

information that an individual who went by the street moniker "Ice" was traveling to Maine with,

and distributing — or "trapping" — illicit drugs.[1] This information was provided by a

confidential informant ("CI"), identified as CI 5638 by MDEA Agent Warren ("Warren") at

hearing. The CI described Ice as being from the New York or Connecticut area, thirty seven

years old, clean shaven, clean cut, heavy set, and likely to be in possession of a backpack or

another, smaller, luggage transportation device. CI 5638 also informed Warren that Ice often

---

[1] "Trapping" is a term often used by law enforcement and other individuals directly involved in the drug trade that describes the process of selling and distributing contraband.

traveled to Maine by bus and stayed at either 53 Briarwood Avenue or 61 Ridgeland Avenue while in the State. Both homes are located in South Portland and known to police as being associated with frequent drug activity. Based on the CI's description of Ice, and his known association with the Briarwood and Ridgeland residences, MDEA identified a potential match for Ice named Eliot Sibley. Sibley was later ruled out after a photo of him was shown to the CI for corroboration.

On August 10th, 2021, the CI informed Warren that Ice may be traveling to Maine that day. The CI was not able to confirm this information and, as such, no surveillance or interdiction efforts were made by Warren or MDEA agents on that day. On August 13th, 2021, the CI again informed Warren that Ice would be traveling to Maine. The CI did not give an exact time for Ice's arrival as he often traveled to Maine with little or no notice.

Beginning at approximately 5:30 pm on August 13th, MDEA Agent Warren and fellow agent Matthew Morrison ("Morrison"), along with Portland regional MDEA task force assignees Sergeant Calloway and Officer Demchak, began surveillance of the Portland Transportation Center ("PTC").[2] The PTC is a Portland based hub for Concord Coach Lines and the Amtrak train. Agent Morrison was positioned closer to the PTC building and had a direct view inside where he could see the exit/arrival terminals for both Concord Coach Lines and the Amtrak. Agent Warren was positioned further away from the building itself but still had a line of sight into the PTC.

Over the next five or so hours, Agents Warren and Morrison surveilled the PTC in search of Ice. At one point, CI 5638 joined Warren in his own vehicle with the goal of positively identifying Ice were he to arrive at and exit the PTC. The CI joined the surveillance effort for

---

[2] At some point, the exact timing of which could not be ascertained from testimony at hearing, the surveillance team also contacted K-9 Officer Andrew Flynn of the Scarborough Police Department to gauge his and his K-9, Tucker's, availability to conduct a sniff-search if needed.

about two hours but ultimately left without identifying Ice. Around 10:40 pm, the last bus of the day entered PTC and a man roughly matching Ice's description, wearing a backpack, a ballcap, and a face mask lowered beneath his chin, exited the Concord Coach Lines arrival terminal. Agent Morrison first identified the man as a potential match and alerted Agent Warren, as well as Officers Calloway and Demchak.

The man then exited the PTC and engaged one of two taxi drivers waiting for a fare. The man did not enter the first taxi he engaged, but did enter the second, a minivan located directly behind. The cab then exited the PTC, taking a right off PTC's access road, onto the Fore River Parkway. Law enforcement followed the taxi closely with Agent Warren directly behind the cab in an unmarked vehicle. Officers Calloway and Demchak were behind Warren in an unmarked cruiser equipped with blue lights and other traditional features. Agent Morrison was delayed in exiting the PTC and thus tailed the taxi from multiple car lengths behind.

The taxi turned right onto the Fore River Parkway and immediately merged onto Interstate 295 ("I-295") traveling southbound, toward South Portland — the location of both the Briarwood and Ridgeland addresses. The taxi traveled approximately two miles on I-295 to exit three, where it departed the highway and turned left on Westbrook Street in South Portland. Before exiting I-295, Agent Warren noticed and reported that one of the rear registration lamps was out, in violation of 29-A M.R.S. § 1909.

After turning left on Westbrook Street, the vehicle made a right on Broadway Street, a main throughway in South Portland that offered access to the Country Gardens neighborhood, the location of 53 Briarwood Avenue. The taxi then turned left onto Sokokis Street, moving closer to the known trap house. Multiple officers reported at hearing that the taxi driver failed to signal this turn in violation of 29-A M.R.S. § 2071(2).

3

Pursuant to the instruction of Agent Warren and others in pursuit, Officers Calloway and Demchak initiated a traffic stop immediately after the car turned onto Sokokis Street. The taxi complied with the Officers' instruction and pulled to the right side of the roadway. Sergeant Calloway approached and engaged the driver while Officer Demchak spoke with the man police suspected to be Ice in the rear passenger seat. Sergeant Calloway obtained the necessary information and documents from the driver and proceeded with the traffic stop.

Officer Demchak obtained a New York Driver's license from the passenger that identified him as Jerome Morris, the Defendant here. As Officer Demchak spoke with Morris, Morrison approached the rear passenger side window of the taxi and stood behind Officer Demchak. As he did this, Officer Warren dialed a phone number he received from the CI that supposedly belonged to a phone in Ice's possession. As Warren dialed the number, Morrison heard a phone in Morris's possession ring.

Morrison then asked Morris to step out of the vehicle and detained him, telling him he was not free to leave. The law enforcement agents on scene then contacted Scarborough Police Officer Andrew Flynn who was on duty with his drug detection K-9, Tucker. Within minutes, Officer Flynn and Tucker arrived on scene and, with the consent of the taxi driver, initiated a K-9 sniff of the vehicle.[3] Tucker began at the rear of the vehicle and moved past the open, rear passenger side door, where Officer Flynn observed a snap of Tucker's head consistent with his identification of a scent of interest. Tucker then entered the vehicle through that open door and alerted on the backpack appearing to be the one Morris had been wearing when he entered the taxi.

---

[3] At hearing, Agent Warren estimated that nine minutes elapsed from the moment the traffic stop was initiated to the moment Officer Flynn and his K-9 Tucker arrived to conduct a search of the vehicle. The exhibits corroborate this estimation.

4

After Tucker's indication on the backpack, Morrison searched the item, identifying and removing multiple bags which contained white substances later confirmed to be cocaine, methamphetamine, and fentanyl. Morris was then arrested on suspicion of drug trafficking and subsequently made statements that Morris contends are incriminating in nature.

After his arrest, Morris was charged with five counts, including Aggravated Trafficking of Scheduled Drugs (Cocaine), Class A; Aggravated Trafficking of Scheduled Drugs (Fentanyl), Class A; Aggravated Illegal Importation of Schedule W Drugs (Cocaine), Class A; Illegal Importation of Scheduled Drugs (Fentanyl), Class B; and Criminal Forfeiture. On November 4th, 2021, Morris was indicted on these five counts, as well as two additional counts of Unlawful Possession of Scheduled Drugs, Class C (Cocaine and Fentanyl).

On February 2nd, 2022, Morris filed the instant Motion to Suppress seeking to suppress the stop of the taxi, the subsequent search of the backpack and any incriminating statements made that are fruit of the alleged unlawful conduct. A hearing was held on the Motion in the Cumberland County Superior Court on March 21st, 2022.

## DISCUSSION

In his Motion, Morris asks this court to suppress the initial stop of the taxi, as well as all evidence gained from that supposed unlawful stop. To do this, he alleges that the traffic stop was not supported by reasonable articulable suspicion, that, in the event it was, such stop was extended longer than was necessary to complete its mission in violation of *Rodriguez v. United States*, and that the ultimate search of the backpack which produced incriminating physical evidence was not supported by probable cause.

### I. Reasonable Articulable Suspicion for Traffic Stop

Morris's first argument for suppression of the traffic stop initiated by Sergeant Calloway and Officer Demchak was not supported by reasonable articulable suspicion, the threshold level needed to initiate such a stop under both the United States and Maine Constitutions

"The Fourth Amendment to the United States Constitution and article I, section 5 of the Maine Constitution protect motorists from being unreasonably stopped by police." *State v. LaForge*, 2012 ME 65, ¶ 8, 43 A.3d 961. For a traffic stop to be constitutional, "a police officer must have an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." *State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984.

"Reasonable articulable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *State v. Porter*, 2008 ME 175, ¶ 8, 776 A.2d 1223. The only requirement that the Law Court has imposed on reasonable articulable suspicion is that such suspicion be more than speculation or an unsubstantiated hunch. *State v. Burgess*, 2001 ME 117, ¶ 8, 776 A.2d 1223.

Here, this Court finds that there was reasonable articulable suspicion that criminal conduct had occurred, was occurring, or was about to occur. A review of officer testimony at hearing and the stipulated exhibits support that the following facts inform the objective analysis: a CI who has assisted with investigations in the past and gone through the MDEA's vetting process, reported that an individual who uses the street moniker "Ice" was traveling to Maine by bus, for the purpose of distributing drugs. The CI reported that Ice was a heavy set, clean cut and clean shaven black male, approximately thirty seven years in age. The CI also reported that, when in Maine, Ice stayed at — and "trapped" out of — one of two residences that are known to

6

be part of the same drug distribution network: 61 Ridgeland Avenue and 53 Briarwood Avenue, both located in South Portland.

At approximately 10:40 pm, on August 13th, 2021, after receiving a tip from the same CI that Ice was traveling to Maine and would be carrying a backpack or other smaller storage device, a black male roughly matching the CI's description of Ice disembarked an inbound Concord Coach Lines bus and exited the terminal. He engaged one taxi driver, declining to ride with him or her, and entered a second taxi located immediately behind the first.[4] The taxi exited the bus station and turned onto the interstate headed in the direction of South Portland, the town where 53 Briarwood Avenue and 61 Ridgeland Avenue are located. The taxi pulled off the interstate in South Portland. Police followed the vehicle until it turned into the neighborhood that included the 53 Briarwood Avenue location and was stopped about two blocks from that address.

Morris's appearance and activity once disembarking the Concord Coach Lines bus sufficiently corroborated the CI's tip that Ice would be traveling to Maine with the intent to distribute drugs. Taken altogether, this information, from the viewpoint of an objectively reasonable officer, constitutes more than an unsubstantiated hunch. Therefore, this court concludes that Sergeant Calloway and Officer Demchack's stop of the taxi Morris was traveling in was supported by reasonable articulable suspicion that criminal activity was afoot.[5]

## II. Rodriguez Violation

---

[4] In isolation, the decision not to ride with one taxi would not indicate much. However, experienced criminal investigators testified at hearing that in their experience, such a "shopping" of taxis was indicative of drug activity.

[5] As noted, there was also testimony that two civil traffic violations occurred which independently supported the surveillance team's decision to stop the cab. Because the officers had sufficiently reasonable and articulable suspicion of trafficking to stop the vehicle based on information provided by the CI and another source of information. And because they confirmed by the apparent destination of the taxi, the court does not reach the traffic violations.

7

Since the stop was supported by articulable suspicion, Morris next argues that the traffic stop continued longer than was necessary to complete the mission of the stop in violation of the U.S. Supreme Court's holding in *Rodriguez v. United States*, 575 U.S. 348, 357 (2015).

In *Rodriguez*, the Court held that, absent reasonable articulable suspicion to prolong a traffic stop longer than necessary to complete the stop's purpose, the stop must terminate. *Id.* Beyond determining whether to issue a traffic ticket, an officer's traffic stop includes "ordinary inquiries incident to the traffic stop." *Id.* at 357. Although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Ordinarily, a dog sniff is not fairly characterized as part of the officer's traffic mission. *Id.*

Here, the stop was supported by reasonable articulable suspicion of drug activity. The stop was not overly burdensome given the nature of the suspicion. Furthermore, in addition to what was known at the time of the stop, two more pieces of information became known which bolstered officer suspicion. First, Morris told Officer Demchak that his address was 61 Ridgeland Road, the other known, drug-associated address in the suspected distribution network. Second, approximately five minutes into the stop, mere moments after Officer Calloway called the driver's information in to dispatch for a records check, Agent Warren called the phone number associated with Ice and a phone in Morris's possession rang.

Accordingly, objectively reasonable, articulable suspicion of criminal activity existed to prolong the stop. There was no *Rodriguez* violation.

## I. Search of Backpack

Morris's third argument for suppression is that law enforcement lacked the probable cause needed to search the backpack Morris was wearing when he arrived, located inside the taxicab on the rear driver's side passenger seat.

Under the Fourth Amendment to the United States Constitution and Me. Const. art. I, § 5, a warrantless search is generally unreasonable unless it was conducted pursuant to a recognized exception to the warrant requirement. *State v. Melvin*, 2008 ME 118, ¶ 6, 955 A.2d 245. One such exception to the warrant requirement applies to automobiles whom law enforcement have probable cause to believe possess contraband. *See Carroll v. United States*, 267 U.S. 132, 149 (1975); *United States v. Ross*, 456 U.S. 798, 809-10, (1982). If the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. *Carroll*, 267 U.S. at 149. A search of a vehicle does not violate the Fourth Amendment's protections against unreasonable search and seizure "if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." *Ross*, 456 U.S. at 809. A lawful search of a fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. *Id.* at 821.

In this context, "probable cause exists where facts and circumstances within the knowledge of the officers and of which they have reasonably trustworthy information would warrant a prudent and cautious person" to believe that the vehicle subject to search contains contraband. *See State v. Lagasse*, 2016 ME 158, ¶ 13, 149 A.3d 1153. It includes the collective information known to the police and is not limited to the personal knowledge of the arresting

officer, *State v. Carr*, 1997 ME 221, ¶ 7, 704 A.2d 353, and is an objective standard. *State v. Enggass*, 571 A.2d 823, 825 (Me. 1990).

When a dog sniff is involved in the police's investigation, "the question — similar to every inquiry into probable cause — is whether all the facts surrounding the dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013). "A sniff is up to snuff when it meets that test." *Id.*

In this case, the Court finds that the collective information known to law enforcement at the time they decided to search the automobile for drugs — and the backpack within it — supports a finding of probable cause. At the time law enforcement decided to search the vehicle and the backpack, they had all the knowledge which informed their stop of the vehicle. They also had a statement from Morris that he lived at 61 Ridgeland Avenue, a residence far from the taxi's location and an address known to be involved in drug distribution. They also were able to identify one of the phones in Morris's possession as a match to the number for Ice provided by the CI. Finally, they had an alert on the backpack by Tucker, a certified drug detection K-9. All of this information, taken together, would cause a reasonable and prudent person to believe that the automobile contained contraband. Thus, the warrantless search of the automobile and the backpack contained therein, was supported by probable cause and was not violative of Morris's Fourth Amendment rights.

## CONCLUSION

The traffic stop of the taxi Morris was riding in was supported by reasonable articulable suspicion of criminal activity. This suspicion, bolstered by the ringing of a phone in Morris's possession when a number associated with Ice was called and Morris's recitation of a known trap

10

house as his Maine address, also supported prolonging the traffic stop for the purposes of a dog sniff. The indication of that dog on a backpack located within the taxi, combined with all other knowledge known to officers at the time, constituted sufficient probable cause to search the automobile for contraband. Jerome Morris's Motion to Suppress is Denied.

Dated: 4/11/22

Thomas R. McKeon
Justice, Maine Superior Court